**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION**

| | | |
|---|---|---|
| **PENNY NUNEZ MEZA,** | ) | CASE NO. 1:09CV0991 |
| Plaintiff, | ) | |
| v. | ) | MAGISTRATE JUDGE GREG WHITE |
| **MICHAEL J. ASTRUE,** Commissioner of Social Security, | ) ) ) | |
| Defendant. | ) | MEMORANDUM OPINION & ORDER |

Plaintiff, Penny Nunez Meza ("Nunez Meza"), challenges the final decision of the Commissioner of Social Security, Michael J. Astrue ("Commissioner"), denying Nunez Meza's claim for a Period of Disability ("POD") and Disability Insurance Benefits ("DIB") under Title II of the Social Security Act ("Act"), 42 U.S.C. § 416(i) 423 *et seq*. This Court has jurisdiction pursuant to 42 U.S.C. § 405(g). The case is before the undersigned United States Magistrate Judge pursuant to the consent of the parties entered under the authority of 28 U.S.C. § 636(c)(2).

For the reasons set forth below, the Court vacates the final decision of the Commissioner and remands for further administrative proceedings consistent with this Order.

### I. Procedural History

On April 18, 2005, Nunez Meza filed applications for POD and DIB benefits alleging a disability onset date of March 15, 2004, due to numerous impairments including psoriasis, back pain, breathing problems, migraines, and depression. (Tr. 47.) Her application was denied both initially and upon reconsideration. Nunez Meza timely requested an administrative hearing.

On June 18, 2008, a video teleconference hearing was held before an Administrative Law Judge ("ALJ") from Illinois, while Nunez Meza and the Vocational Expert ("VE") appeared

from Cleveland, Ohio. On September 19, 2008, the ALJ found that Nunez Meza could not perform her past relevant work, but had the residual functional capacity ("RFC") to perform a significant number of jobs in the national economy. She was, therefore, found not to be disabled within the meaning of the Act. The ALJ's decision became the final decision of the Commissioner after the Appeals Council denied further review.

On appeal Nunez Meza claims the ALJ erred by failing to consider (1) all of her limitations in calculating the RFC; and (2) the impact of her obesity in determining whether the combination of impairments met or equaled a listing. (Doc. No. 17 at 11, 12.)

## II. Evidence

### Personal and Vocational Information

Nunez Meza was born on November 17, 1964, making her 40 at the time of the ALJ's decision. (Tr. 77.) She did not graduate from high school, but obtained a GED. (Tr. 460.) She has past relevant work experience as an office cleaner, assembly line worker, cleaner, fast food worker, food service worker, and cook. (Tr. 481.) She stopped working in May 2004. (Tr. 123-124.)

### Medical Evidence

On October 9, 2003, Nunez Meza was treated in the Emergency Room of Community Health Partners in Lorain, Ohio, for acute or chronic plantar fasciitis of the left foot and a small heel spur. (Tr. 362.) X-rays of the left foot confirmed mild degenerative changes, particularly at the first metatarsophalangeal joint, along with some spurring of the inferior and posterior calcaneus. (Tr. 368.)

On December 10, 2004, Nunez Meza presented to A.K. Bhaiji, M.D., a State Agency doctor, for a consultative physical examination. (Tr. 175-181.) Dr. Bhaiji found that she was 4'10" tall and weighed 230 pounds. (Tr. 175.) She reported a history of back pain. *Id.* Dr. Bhaiji noted that she had psoriasis on her palms, soles, and legs and that it was hard for her to stand and walk because of discomfort. *Id.* The doctor also noted a spur on Nunez Meza's left foot. *Id.* Nunez Meza had some abnormal grasp and manual functioning due to the psoriasis on her palms, and slight limping in her gait, but had no need for an ambulatory aid. (Tr. 176-78.) It

2

was further noted that she had decreased lumbar ranges of motion. (Tr. 180.) She had a normal lung examination, with no rales, rhonchi, or wheezing. (Tr. 176.) Her mental status was normal; she had normal reflexes, motor, and sensory responses in her upper and lower extremities, and she exhibited no neurological abnormalities. *Id.* Dr. Bhaiji diagnosed lumbar sprain/strain, psoriatic arthritis, history of alcoholism, and reactive airway disease. (Tr. 177.) The doctor further opined that Nunez Meza would have difficulty standing, walking, lifting, carrying, and handling objects, traveling, zipping zippers, counting coins, and opening jars, but would have no difficulty sitting. *Id.*

On January 6, 2005, Eli N. Perencevich, D.O., a state agency physician, reviewed Nunez Meza's medical records and completed a physical RFC assessment. (Tr. 182-189.) He relied upon findings of lumbosacral strain and sprain, psoriatic arthritis, reactive airway disease, and headaches to reach the conclusion that Nunez Meza retained the capacity for work that involved lifting 50 pounds occasionally and 25 pounds frequently, standing or walking for about six hours a day, sitting for about six hours a day, and unlimited pushing and pulling. (Tr. 183.) Nunez Meza reported that she could walk for four hours before experiencing pain. Dr. Perencevich attributed the pain to a left heel spur and psoriasis on the bottom of both feet. *Id.* He further noted that she had chronic lumbar back problems, but her straight leg raise test was negative, her gait was slightly limping, possibly due in part to the heel spur, and her reflexes and sensation were normal. *Id.* He also noted that she had psoriasis on her hands which affected her fine coordination, grasp, pinch, and manipulation to some extent, but her ranges of motion and fingers were normal. *Id.* Nunez Meza reported having reactive airway disease, but took no medications and had no recent hospital visits. *Id.* Her chest x-ray was normal. *Id.* Nunez Meza reported that she took over-the-counter medication for headaches, but she had no recent hospitalizations or follow-up treatment for headaches. (Tr. 184.) Dr. Perencevich concluded that Nunez Meza's accounts of her daily living regarding the severity of her symptoms were credible. (Tr. 187.)

Based on these conclusions, Dr. Perencevich limited Nunez Meza to climbing ramps and stairs occasionally, but never climbing ladders, ropes and scaffolds. He also allowed that she

could stoop and crouch frequently. (Tr. 184.). He further limited her to frequent (as opposed to constant) fingering of objects, due to psoriasis. (Tr. 185.) He noted that she should avoid concentrated exposure to fumes, odors, dusts, gases, and poor ventilation due to her reactive airway disease. (Tr. 186.)

Between January 2005 and June 2005, Nunez Meza presented to Hardeep Grewal, M.D., at Family Care Center of Lorain. (Tr. 190-206, 289-295, 301-302.) She was treated for chronic obstructive pulmonary disease ("COPD") and dyspnea on exertion, as well as elevated blood pressure and cholesterol. (Tr. 191-193, 289-291.) Pulmonary testing was normal, and showed mild decreases in breathing capacity that improved with bronchodilation. (Tr. 201-202.) She was obese, weighing 237 pounds. (Tr. 191-193, 291.) Heart testing was generally normal, with no signs of myocardial ischemia or infarction. She had normal left ventricular function, and a normal echocardiogram. (Tr. 294-295.) Dr. Grewal recommended that Nunez Meza see a dermatologist and undergo an overnight polysomnography to evaluate her sleep apnea. (Tr. 193, 194, 302.) Pulmonary function testing on January 31, 2005, indicated COPD with emphysema. (Tr. 201.)

On March 10, 2005, on the recommendation of Dr. Grewal, Nunez Meza underwent a sleep study. (Tr. 292-293.) The polysomnography report indicated severe obstructive sleep apnea. It was recommended that she engage in continuous positive airway pressure ("CPAP") therapy, lose weight, and avoid sedatives and alcohol. (Tr. 293.)

From May 10, 2005 through May 12, 2005, Nunez Meza was hospitalized with symptoms of a cough and shortness of breath. (Tr. 359-360.) Upon discharge, her diagnoses included bilateral pneumonia, COPD, obesity, psoriasis, and nicotine abuse. (Tr. 359.) Discharge medications included Spiriva, Advair, Albuterol, Azithromycin, Ceftin, prednisone, and Pepcid. (Tr. 360.)

On May 25, 2005, Willa Caldwell, M.D., a state agency reviewing physician, completed a physical RFC assessment after reviewing updated medical records. The noted diagnoses was lumbosacral strain and sprain, psoriatic arthritis, reactive airway disease, and headaches. (Tr. 207-14.) Dr. Caldwell reviewed the medical findings from the December 2004 consultative

4

examination, the January 2005 physical examination, and the 2005 pulmonary function study. (Tr. 208.) The doctor concluded that Nunez Meza retained the capacity to perform medium work, that is lifting 50 pounds occasionally and 25 pounds frequently, standing or walking for about six hours a day, sitting for about six hours a day, together with the unlimited ability to push and pull. (Tr. 208.) In addition, Dr. Caldwell limited Nunez Meza to occasional climbing of stairs and ramps, balancing, stooping, kneeling, crouching, and crawling, and no climbing of ladders, ropes, or scaffolds. (Tr. 209.) She was also limited to frequent fingering due to psoriasis (Tr. 210) and was to avoid concentrated exposures to fumes, odors, dust, gases, and poor ventilation. (Tr. 211.)

On June 13, 2005, a caseworker from the Disability Assistance Program interviewed Nunez Meza. (Tr. 317-318.) The caseworker indicated in her report that Nunez Meza could look after her personal needs, such as cooking, cleaning, and shopping, and could participate in social activities outside the home. (Tr. 317.) She also reported that Nunez Meza had no observed difficulties in speaking, understanding, sitting, hearing, seeing, or walking. *Id.* Her disabling condition was recorded as emphysema, but the caseworker noted that she observed no mental or physical limitations. (Tr. 318.) Her other medical conditions were listed as psoriasis, COPD, high cholesterol, and obesity. (Tr. 319.)

On June 22, 2005, Nunez Meza reported to Dr. Grewal that she was experiencing headaches and taking ibuprofen without benefit. (Tr. 289.) He ordered a CT scan of the paranasal sinuses which revealed mild, likely-chronic right posterior ethmoid sinus disease. (Tr. 310-311.)

On August 1, 2005, Richard Davis, a clinical psychologist, conducted a state agency consultative psychological evaluation. (Tr. 215-221.) Nunez Meza reported that she had a history of drug and alcohol use. (Tr. 215.) She also stated that her children were taken away due to her substance abuse problems; and, that she had been abusing substances since she was 17 years old. (Tr. 216.) She further reported being arrested at least four times, with the last occurrence in September 2003. Her offenses included petty theft, criminal trespassing, and forgery in order to obtain drugs and alcohol. *Id.* She claimed that she stopped drinking alcohol a

5

year earlier, and had stopped cocaine use five years earlier. *Id.*

Dr. Davis noted that Nunez Meza presented with a shabby appearance and did not understand the purpose of the examination, stating, "I need someone to talk to." (Tr. 217.) She reported that she eats way too much and has difficulty sleeping. *Id.* She cried several times throughout the evaluation and stated that she feels worthless and hopeless. *Id.* She had difficulty understanding some of Dr. Davis' questions and was not able to do serial sevens. (Tr. 218.) He further noted that Nunez Meza presented with limitations in her abilities to think logically and use common sense and judgment. (Tr. 220.) Dr. Davis' diagnoses was adjustment disorder with occasional depression, polysubstance dependence, borderline intellectual functioning. She was assigned a GAF score of 55, indicative of "moderate to serious symptoms."[1] (Tr. 220-221.)

In October, 2005, Douglas Pawlarczyk, Ph.D., a state agency psychologist, reviewed Nunez Meza's medical records and assessed her functioning. (Tr. 270-287.) He listed her diagnoses as occasional depression, polysubstance dependence in remission, and borderline functioning capabilities overall. (Tr. 272.) He stated that Nunez Meza does not have a severe impairment that meets or equals the criteria of the Listings 12.04 and 12.05. *Id.* Nunez Meza's medical records showed that she was able to perform self-care and household activities and had no problems getting along with co-workers and supervisors. The report indicated that she had limited interaction with the public, but was able to interact with her family. (Tr. 272.) In his Psychiatric Review Technique, Dr. Pawlarczyk opined that Nunez Meza was moderately restricted in her activities of daily living, had moderate difficulties in maintaining social functioning, and had moderate difficulties in maintaining concentration, persistence, and pace. (Tr. 284.) Dr. Pawlarczyk concluded that Nunez Meza was able to do simple, routine tasks, that she would perform best in a slower paced environment due to borderline functioning capabilities,

---

[1] A GAF score between 51-60 indicates "[m]oderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks), or moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers)." Am. Psychiatric Ass'n, Diagnostic and Statistical Manual of Mental Disorders at 34 (4th ed., Text Rev. 2000).

and that she would do best not engaging in tasks involving lots of people or the public. (Tr. 272.)

In November 2005, Nunez Meza began seeing Rebecca L. Miller, M.D. (Tr. 300.) Nunez Meza reported back pain, hypertension, high cholesterol, psoriasis, hematuria, depression, chronic ethmoidal sinusitis, COPD, and obstructive sleep apnea. *Id.* She also reported that she could not afford any medications for these conditions. *Id.* On exam, Dr. Miller noted dry, scaly patches over both elbows and knees, tenderness over the ethmoidal sinuses, decreased air entry, poor insight and judgment, flat affect, decreased ROM on forward/backward bending, positive paraspinal tenderness at L3-4 with positive leg lift, wheezing, depression, and insomnia. *Id.* Nunez Meza weighed 242 pounds. *Id.*

In March 2006, Kancherla Rao, M.D., a psychiatrist, performed a psychiatric evaluation at the Nord Center. (Tr. 421-423.) Dr. Rao noted that Nunez Meza had complained of depression over the past ten to twelve years which worsened in the past two years because of an abusive relationship with her boyfriend. (Tr. 421.) She also reported a history of alcohol and cocaine abuse, along with legal difficulties and incarceration for theft and forgery related to her cocaine addiction. *Id.* She claimed to have stopped using cocaine in January, 2006. *Id.* Nunez Meza's mental status examination revealed that her appearance was disheveled and unkempt, and she seemed depressed and tense. (Tr. 422.) She had spontaneous, coherent, and relevant speech, and she had appropriate thought content. *Id.* She also had normal orientation, and no gross memory or intellectual impairment. *Id.* Dr. Rao diagnosed major depression, cocaine dependence in early remission, and alcohol abuse in early remission. *Id.* She recommended treatment with Effexor and psychotherapy. (Tr. 423.)

On June 9, 2006, a county medical services disability determination form was signed by Susan Chapman, a technical advisor at County Medical Services, indicating that Nunez Meza had met the disability criteria for Listing 3.10 (sleep-related breathing disorders). (Tr. 313-314.)

The onset date was reported as April 1, 2005.[2]

In September and October 2006, Vickie Baker, M.D., of the Cleveland Clinic, treated Nunez Meza for psoriasis, which was characterized as mild and improving with Enbrel treatment. (Tr. 320-324.)

In April 2007, Jouita Reyes, M.D., began treating Nunez Meza for psoriasis. (Tr. 351-352.) She was obese, but her blood pressure was controlled. *Id.* Dr. Reyes continued to treat her physical condition through February 2008. (Tr. 453-455.) From November 2007 to March 2008, Nunez Meza received outpatient therapy at Nord Mental Health Center for depression and anxiety. (Tr. 448-452.) On February 21, 2008, Nunez Meza weighed 259 pounds. (Tr. 454.)

**Hearing Testimony**

At the hearing on June 18, 2008, Nunez Meza testified to the following:

- She is 4' 10" tall and weighs about 250 pounds. (Tr. 459.)

- She lives alone in an apartment on the third floor and climbs the stairs to her apartment every other day. (Tr. 460, 468.)

- She uses a CPAP machine and two different inhalers to treat her asthma. (Tr. 462.)

- She experiences lower back pain that shoots through her hips and down the back of her legs. (Tr. 463-464.) She also has daily headaches and psoriasis all over her body. (Tr. 464-465.)

- The last time she was hospitalized was in 2004 when she had pneumonia. (Tr. 462.)

- She takes medications for hypertension, which has kept her blood pressure under control. (Tr. 463.)

- She also takes Naprosyn and aspirin for her back. *Id.*

- She takes ibuprofen for headaches, which she has about every day. (Tr. 465.)

- She has no side effects from her medications. (Tr. 463.)

- She no longer takes medication for a sinus problem, and no longer has therapy for her feet. (Tr. 464.)

---

[2]The Commissioner contends the onset date was actually April 1, 2006, but was written over with the date April 1, 2005. Further, the Commissioner contends that there were no medical findings accompanying the form and no indication whether a doctor had evaluated Nunez Meza to support this conclusion. (Doc. No. 20 at 8.)

- The treatment she received for her psoriasis helped, but she still experiences pain that interferes with her ability to concentrate due to pain, itching and irritation. (Tr. 477.)

- She has seen a counselor for depression and anxiety, but has not taken any medication. (Tr. 466.)

- She quit smoking about two or three months before the hearing. (Tr. 462-463.)

- She has not had any alcohol for one year, and attended Alcoholics Anonymous meetings and counseling a few years ago for her addiction. (Tr. 466, 470.)

- The last time she used cocaine was 2-1/2 to 3 years ago. (Tr. 466.)

- She has had no legal problems due to her substance abuse, such as driving while intoxicated arrests or drug possession charges. (Tr. 466-467.)

- She has lost jobs due to her substance abuse. (Tr. 467.)

- She cannot stand on her feet for more than two hours at a time before she needs to sit down and elevate her feet. (Tr. 467-468.) She cannot lift more than ten pounds, and has difficulty with bending, stooping, crouching, crawling, and kneeling. (Tr. 468.)

- Her hands are sore most of the time. (Tr. 469.)

- She usually takes a two hour nap during the day. *Id.*

- She cannot concentrate on one specific thing for a long period of time, usually not more than 20-25 minutes. (Tr. 474.)

- She has no difficulty with personal care, getting dressed, taking a shower, or preparing meals. (Tr. 469.)

- She goes grocery shopping, washes dishes and does laundry. (Tr. 469, 471.)

- She vacuums the floor and takes out the garbage. (Tr. 470.)

- She socializes with her family, but does not visit friends or attend church. *Id.*

- She likes to buy ceramics and paint them as a hobby. *Id.*

The ALJ posed the following hypothetical to the VE:

Consider an individual such as the claimant's age, education, and work experience restricted to light work; should never climb ladders, ropes, or scaffolding; can occasionally climb ramps and stairs; occasionally balance, stoop, crouch, kneel, and crawl. Such an individual should avoid concentrated exposure to lung irritants. Such an individual should avoid concentrated exposure to wetness, humidity, and temperature extremes as well as avoid concentrated exposure to chemical and irritants using the hands. Such an individual can only use the hands frequently for fine manipulation; should come in only occasional contact with the public, co-workers, and supervisors, and is restricted to unskilled

9

work.

(Tr. 482.)

The VE testified that such an individual could not perform Nunez Meza's past relevant work. *Id.* The VE did, however, identify several jobs that the hypothetical person could perform, including bench assembler (900 local jobs), wire worker (1,100 local jobs), and final assembler (600 local jobs). *Id.*

A second hypothetical was posed to the VE assuming an individual the same age, education, and work experience, but reducing the work level to sedentary. The VE testified that the numbers given for the final assembler would remain the same, but the bench assembler positions would be 400 local jobs and the wire worker would be 500 local jobs. (Tr. 483-484.)

The ALJ next asked the VE to assume the individual "would be off task at least 10 percent of the normal workday for various reasons including pain in the hands or problems with concentration" or that she would be absent from work one day per week on average. The VE testified that such a person would require a special accommodation, and no jobs would be available. (Tr. 484.)

### III. Standard for Disability

In order to establish entitlement to DIB under the Act, a claimant must be insured at the time of disability and must prove an inability to engage "in substantial gainful activity by reason of any medically determinable physical or mental impairment," or combination of impairments, that can be expected to "result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. §§ 404.130, 404.315 and 404.1505(a).[3]

---

[3]The entire five-step process entails the following: First, the claimant must demonstrate that she is not currently engaged in "substantial gainful activity" at the time she seeks disability benefits. Second, the claimant must show that she suffers from a "severe impairment" in order to warrant a finding of disability. A "severe impairment" is one which "significantly limits . . . physical or mental ability to do basic work activities." Third, if the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the impairments meet a listed impairment, the claimant is presumed to be disabled regardless of age, education, or work experience. 20 C.F.R. § 404.1520(d) (2009). Fourth, if the claimant's impairment does not prevent her from doing her past relevant work, the claimant is

10

A claimant is entitled to POD only if (1) she had a disability; (2) she was insured when she became disabled; and (3) she filed while she was disabled or within twelve months of the date the disability ended. 42 U.S.C. § 416(i)(2)(E); 20 C.F.R. 404.320.

Nunez Meza was insured on her alleged disability onset date, March 15, 2004, and remained insured through September 30, 2005. (Tr. 11.) Therefore, in order to be entitled to POD and DIB, Nunez Meza must establish a continuous twelve-month period of disability commencing between March 15, 2004 and September 30, 2005. Any discontinuity in the twelve-month period precludes an entitlement to benefits. *See Mullis v. Bowen*, 861 F.2d 991, 994 (6th Cir. 1988); *Henry v. Gardner*, 381 F.2d 191, 195 (6th Cir. 1967).

### IV. Summary of Commissioner's Decision

After considering the entire record, the ALJ made the following findings regarding Nunez Meza:

1. She met the insured status requirements on September 30, 2005. (Tr. 13.)

2. She did not engage in substantial gainful activity during the period from the alleged onset date of March, 15, 2004, through her date last insured, September 30, 2005. *Id.*

3. She has the following severe impairments, in combination: chronic obstructive pulmonary disease; sleep apnea, obesity, degenerative changes of the left foot, psoriasis, adjustment disorder, borderline intellectual functioning, history of polysubstance abuse, and sinus disease. *Id.*

4. She does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. (Tr. 14.)

5. She has the residual functional capacity to perform sedentary work subject to postural limitations against climbing ladders, ropes, and scaffolds; more than

---

not disabled. For the fifth and final step, even if the claimant's impairment does prevent her from doing her past relevant work, if other work exists in the national economy that the claimant can perform, the claimant is not disabled. *Abbott v. Sullivan*, 905 F.2d 918, 923 (6th Cir. 1990).

11

>> occasionally kneeling, stooping, crouching, crawling, or climbing of ramps and stairs; manipulative limitations against more than frequent fine manipulations; environmental limitations against concentrated exposure to chemicals and irritants to hands and concentrated exposure to lung irritants, humidity, wetness, temperature extremes; and, limited to unskilled jobs not requiring more than occasional contact and/or interaction with the public, co-workers and supervisors. (Tr. 16.)

6. She is unable to perform her past relevant work. (Tr. 20.)
7. Considering her age, education, work experience, and residual functional capacity, jobs exist in significant numbers in the national economy that she could perform. (Tr. 20, 21.)
8. She has not been under a disability at any time from March 15, 2004, the alleged onset date, through September 30, 2005, the date she was last insured. (Tr. 21.)

### V. Standard of Review

This Court's review is limited to determining whether there is substantial evidence in the record to support the ALJ's findings of fact and whether the correct legal standards were applied. *See Elam v. Comm'r of Soc. Sec.*, 348 F.3d 124, 125 (6th Cir. 2003)("decision must be affirmed if the administrative law judge's findings and inferences are reasonably drawn from the record or supported by substantial evidence, even if that evidence could support a contrary decision."); *Kinsella v. Schweiker*, 708 F.2d 1058, 1059 (6th Cir. 1983). Substantial evidence has been defined as "[e]vidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance." *Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1966); *see also Richardson v. Perales*, 402 U.S. 389 (1971).

The findings of the Commissioner are not subject to reversal merely because there exists in the record substantial evidence to support a different conclusion. *Buxton v. Halter*, 246 F.3d 762, 772-3 (6th Cir. 2001)(citing Mullen, 800 F.2d 535, 545 (6th Cir. 1986)); *see also Her v. Comm'r of Soc. Sec.*, 203 F.3d 388, 389-90 (6th Cir. 1999)("Even if the evidence could

reasonably support the conclusion reached. *See Key v. Callahan*, 109 F.3d 270, 273 (6th Cir. 1997).") This is so because there is a "zone of choice" within which the Commissioner can act, without the fear of court interference. *Mullen*, 800 F.2d at 545 (*citing Baker v. Heckler*, 730 F.2d 1147, 1150 (8th Cir. 1984)).

In addition to considering whether the Commissioner's decision was supported by substantial evidence, the Court must consider whether the proper legal standard was applied. Failure of the Commissioner to apply the correct legal standards as promulgated by the regulations or failure to provide the reviewing court with a sufficient basis to determine that the Commissioner applied the correct legal standards are grounds for reversal where such failure prejudices a claimant on the merits or deprives a claimant of a substantial right. *See White v. Comm'r of Soc. Sec.*, 572 F.3d 272 (6th Cir. 2009); *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2006).

## VI. Analysis

Nunez Meza contends the ALJ erred by failing to consider (1) all of her limitations in calculating the RFC; and (2) the impact of her obesity in determining whether the combination of impairments met or equaled a listing. (Doc. No. 17 at 11, 12.)

**Social Security Rule 02-1p and Obesity/Sleep Apnea**

Nunez Meza first argues that the ALJ did not follow the procedures set out in Social Security Regulation ("S.S.R.") 02-1p, which establishes the guidelines for evaluating obesity. The Commissioner contends that the ALJ, rather than specifically discussing obesity, relied on medical reports that took Nunez Meza's obesity into account. Nunez Meza counters, however, that none of the state agency opinions upon which the ALJ relied mentioned her obesity.

S.S.R. 02-1p, in pertinent part, states as follows:

Obesity is a risk factor that increases an individual's chances of developing impairments in most body systems.[4] It commonly leads to, and often complicates,

---

[4]To classify overweight and obesity in adults, the National Institute of Health relies on an individual's Body Mass Index ("BMI"). In adults, a BMI of 25-29.9 is regarded as overweight and a BMI of 30.0 or above as "obesity." S.S.R. 02-1p at *2. Further, the Ruling does not

13

> chronic diseases of the cardiovascular, respiratory, and musculoskeletal body systems. Obesity increases the risk of developing impairments such as type II (so-called adult onset) diabetes mellitus--even in children; gall bladder disease; hypertension; heart disease; peripheral vascular disease; dyslipidemia (abnormal levels of fatty substances in the blood); stroke; osteoarthritis; and sleep apnea. It is associated with endometrial, breast, prostate, and colon cancers, and other physical impairments. Obesity may also cause or contribute to mental impairments such as depression. The effects of obesity may be subtle, such as the loss of mental clarity or slowed reactions that may result from obesity-related sleep apnea.

S.S.R. 02-1p at *3. In addition, because there is no listing for obesity, the Ruling mandates that at step three of the disability analysis:

> . . . . we will find that an individual with obesity "meets" the requirements of a listing if he or she has another impairment that, by itself, meets the requirements of a listing. We will also find that a listing is met if there is an impairment that, in combination with obesity, meets the requirements of a listing. For example, obesity may increase the severity of coexisting or related impairments to the extent that the combination of impairments meets the requirements of a listing. This is especially true of musculoskeletal, respiratory, and cardiovascular impairments. It may also be true for other coexisting or related impairments, including mental disorders.
>
> * * *
>
> We will also find equivalence if an individual has multiple impairments, including obesity, no one of which meets or equals the requirements of a listing, but the combination of impairments is equivalent in severity to a listed impairment. For example, obesity affects the cardiovascular and respiratory systems because of the increased workload the additional body mass places on these systems. Obesity makes it harder for the chest and lungs to expand. This means that the respiratory system must work harder to provide needed oxygen. This in turn makes the heart work harder to pump blood to carry oxygen to the body. Because the body is working harder at rest, its ability to perform additional work is less than would otherwise be expected. Thus, we may find that the combination of a pulmonary or cardiovascular impairment and obesity has signs, symptoms, and laboratory findings that are of equal medical significance to one of the respiratory or cardiovascular listings.

---

provide precise height and weight requirements for obesity. Instead it states that the existence of obesity is established by:

> generally rely[ing] on the judgment of a physician who has examined the claimant and reported his or her appearance and build, as well as weight and height. Thus in the absence of evidence to the contrary in the case record, we will accept a diagnosis of obesity given by a treating source or consultative examiner.

S.S.R. 02-1P at *3.

S.S.R. 02-1p at *5. The Ruling also cautions: "[h]owever, we will not make assumptions about the severity or functional effects of obesity combined with other impairments. Obesity in combination with another impairment may or may not increase the severity or functional limitations of the other impairment. We will evaluate each case based on the information in the case record." S.S.R. 02-1p at *6.

In *Bledsoe v. Barnhart*, 165 Fed Appx. 408, 412 (6th Cir. 2006), the Sixth Circuit called it "a mischaracterization to suggest that Social Security Rule 02-1p offers any particular procedural mode of analysis for obese disability claimants." The ruling "does not mandate for a particular mode of analysis. It only states that obesity, in combination with other impairments, 'may' increase the severity of the other limitations." *Id.* at 411-12. Yet, the ALJ must still "consider the claimant's obesity, in combination with other impairments, at all stages of the sequential evaluation." *Negat v. Comm'r of Soc. Sec.*, 2009 WL 4981686, *3 (6th Cir. Tenn. Dec. 22, 2009) (*citing Bledsoe*, 165 Fed. App'x at 411-12.) Put simply, this is more than a requirement that the ALJ mention the fact of obesity in passing: "courts . . . remand[] even for a mere failure to consider obesity." *Macaulay v. Astrue*, 262 F.R.D. 381, 390 (D. Vt. 2009) (citations omitted); *see also Johnson v. Astrue*, Case No. 08-3658, 2010 WL 148411, *18 (S.D. Tex. Jan. 11, 2010) ("[T]he ALJ should develop the record on the issue of [the claimant's] obesity and how her obesity impacted her ability to function and work. . . ."); *Priestly v. Astrue*, 2009 WL 1457152, *13-14, Case No 6:08-546 (D.S.C. May 22, 2009) ("while the ALJ stated he considered the plaintiff's obesity when determining her RFC, he failed to provide any explanation as to how this severe impairment factored into his assessment.")

The Sixth Circuit rejected a similar argument by a claimant who asserted that because her doctors' reports indicated her to be obese, the ALJ was required to consider it as a possible impairment. *Cranfield v. Soc. Sec. Admin.*, 79 Fed. App'x 852, 857 (6th Cir. 2003). In *Cranfield*, the plaintiff provided no evidence that her obesity affected her ability to work. The *Cranfield* Court relied on 20 C.F.R. § 404.1512(a) as requiring a plaintiff to "furnish medical and other evidence that [the SSA] can use to reach conclusions about [her] medical impairment(s) and ... its effect on [her] ability to work on a sustained basis." *See* 20 C.F.R. § 404.1512(a). The Court

15

found that Cranfield did not satisfy this requirement with respect to an obesity claim, and, therefore concluded that the ALJ had no obligation to address her obesity. *Id*. at 857.

Another federal court in the Sixth Circuit, however, held that obesity and its effects must be given full analysis by the ALJ when considering limitations in calculating a claimant's RFC. *See Rojas v. Astrue*, 2009 WL 465768, Case No. 1:07-cv-1035 (W.D. Mich. Feb. 24, 2009). The *Rojas* Court concluded that the ALJ, even though he may not have ignored the evidence and expert opinion tending to support the plaintiff's claim of disability partially caused by obesity, the ALJ, based on S.S.R. 02-1p, accorded such evidence "legally-insufficient attention." *Id.*

Here, the ALJ found Nunez Meza's obesity to be a severe impairment. Although the ALJ found the obesity to be severe, she merely listed it as an impairment without discussing how it may or may not have increased the severity of coexisting impairments. The ALJ reasoned as follows:

> Claimant's diagnoses of sleep apnea; chronic obstructive pulmonary disease and obesity do not meet the listing requirements found in Section 3.00 in the Listing of Impairments. The listings in this section describe impairments resulting from respiratory disorders based on symptoms, physical signs, laboratory test abnormalities, and response to a regimen of treatment prescribed by a treating source. Respiratory disorders along with any associated impairment(s) must be established by medical evidence. Evidence must be provided in sufficient detail to permit an independent reviewer to evaluate the severity of the impairment. The required level of impairment for these listing [sic] is met with A. documentation of an impairment caused by chronic disorders of the respiratory system and B. clinical evidence of the required level of loss of function.
>
> In this case, claimant's impairments do not meet the required listing level because she has not required multiple emergency room/urgent treatments or hospitalizations.

(Tr. 15.)

Nunez Meza contends that the medical evidence of record shows that her obesity exacerbated her musculoskeletal and respiratory impairments. (Tr. 176-177.) She argues that the evidence shows she has reduced ranges of motion and mobility (Tr. 180, 300), and has significant breathing and sleeping difficulties. (Tr. 291-293, 351, 357-358). Additionally, Nunez Meza contends that the ALJ did not take into consideration her sleep apnea, which the ALJ also found to be a severe impairment. While S.S.R. 02-1p does not prescribe a specific procedure for evaluation of obesity, it does make clear that sleep apnea is an effect of obesity

16

and thus should be considered in analyzing the listings. S.S.R. 02-1p at *3, *6; *see also Dellinger v. Astrue,* 2010 WL 750363, *3-4, Case No. 5:09-310 (E.D. Ky. Mar. 1, 2010) (sleep apnea is an effect of obesity and should be considered under the listings). As the ALJ found obesity and sleep apnea to be severe impairments, she should have taken both into consideration when analyzing the listings.

Although not argued by Nunez Meza, the ALJ also did not consider her obesity or sleep apnea at steps four and five of the disability evaluation. S.S.R. 02-1p further recognizes that a claimant's obesity could affect her exertional limitations and must be considered as follows:

> Steps 4 and 5, Assessing Functioning in Adults
>
> * * *
>
> Obesity can cause limitations of function. The functions likely to be limited depend on many factors, including where the excess weight is carried. An individual may have limitations in any of the external functions such as sitting, standing, walking, lifting, carrying, pushing, and pulling. It may also affect ability to do postural functions, such as climbing, balance, stooping, and crouching. The ability to manipulate may be affected by the presence of adipose (fatty) tissue in the hands and fingers. The ability to tolerate extreme heat, humidity, or hazards may also be affected.
>
> The effects of obesity may not be obvious. For example, some people with obesity also have sleep apnea. This can lead to drowsiness and lack of mental clarity during the day. Obesity may also affect an individual's social functioning.
>
> An assessment should also be made of the effect obesity has upon the individual's ability to perform routine movement and necessary physical activity within the work environment. Individuals with obesity may have problems with the ability to sustain a function over time. As explained in SSR 96-8p ("Titles II and XVI: Assessing Residual Functional Capacity in Initial Claims"), our RFC assessments must consider an individual's maximum remaining ability to do sustained work activities in an ordinary work setting on a regular and continuing basis. A "regular and continuing basis" means 8 hours a day, for 5 days a week, or an equivalent work schedule. [footnote omitted] In cases involving obesity, fatigue may affect the individual's physical and mental ability to sustain work activity. This may be particularly true in cases involving sleep apnea.
>
> The combined effects of obesity with other impairments may be greater than might be expected without obesity. For example, someone with obesity and arthritis affecting a weight-bearing joint may have more pain and limitation than might be expected from the arthritis alone.

S.S.R. 02-01p at *6; *see also Besecker v. Astrue*, 2008 WL 4000911, at *5-6 (S.D.Ohio Aug. 29, 2008)("repeated references to Plaintiff's obesity in the record, including the opinions of several

17

medical sources, should have alerted the ALJ to consider Plaintiff's obesity and its combined impact with his other impairments at Steps 2, 3 and 4 of the sequential evaluation.")

After finding Nunez Meza to have severe impairments of obesity and sleep apnea, the ALJ did not follow the procedures set forth in S.S.R. 02-1p regarding whether these impairments affect the Listings or her RFC. The Court, therefore, concludes that remand is required under "sentence four" of 42 U.S.C. § 405(g).[5] Having found remand is necessary, the Court need not consider Nunez Meza's arguments regarding the RFC calculation.

While the Court finds that the ALJ's decision fails to comply with the relevant legal standards, Nunez Meza can be awarded benefits only if proof of disability is "compelling." *Faucher v. Sec'y of Health and Human Servs.*, 17 F.3d 171 (6th Cir. 1994) (the court can reverse the Commissioner's decision and award benefits only if all essential factual issues have been resolved and proof of disability is compelling). When the ALJ misapplies the regulations or when there is not substantial evidence to support one of the ALJ's factual findings and her decision therefore must be reversed, the appropriate remedy is not to award benefits.

## VII. Decision

For the foregoing reasons, the decision of the Commissioner is vacated and the case remanded for further proceedings consistent with this Order.

IT IS SO ORDERED.

       s/ Greg White
       United States Magistrate Judge

Dated: May 27, 2010

---

[5] Under sentence four of 42 U.S.C. § 405(g), the district court has the authority to reverse, modify, or affirm the decision of the Commissioner. This may include a remand of the case back to the Commissioner for further analysis and a new decision. A sentence four remand is a final judgment. *See Melkonyan v. Sullivan*, 501 U.S. 89, 97-102, 111 S.Ct. 2157, 115 L.Ed.2d 78 (1991).